RICHARD A. STEVENS, Plaintiff and Appellant, v. WAL-
DORF-HOERNER PAPER PRODUCTS COMPANY, a
Corporation, and Missoula Cartage Company, Inc., a Cor-
poration, Defendants and Respondents.

No. 11086.
Submitted March 6, 1967.   Decided April 3, 1967.
Petition for rehearing denied April 26, 1967.
425 P.2d 832.

Lee A. Jordan (argued), Missoula, for appellant.

Garlington, Lohn & Robinson, Boone & Karlberg, Sherman V. Lohn and Karl R. Karlberg (argued), Missoula, for respondents.

HONORABLE VICTOR H. FALL, District Judge, sitting in place of MR. JUSTICE CASTLES, delivered the Opinion of the Court.

This is an appeal by plaintiff from a judgment entered on a directed verdict in favor of defendants.

The plaintiff-appellant is Richard A. Stevens and will be referred to as plaintiff. There are two separate defendants-respondents, Waldorf-Hoerner Paper Products Company, a corporation, (hereinafter called Waldorf-Hoerner) and Missoula Cartage Company, Inc., a corporation, (hereinafter called Missoula Cartage).

The only issue raised by this appeal is whether the district court was correct in directing a verdict in favor of each of the defendants at the close of plaintiff's evidence.

The facts in this action disclose the following: Waldorf-Hoerner operates a large (by Montana standards) industrial complex some 15 miles west of Missoula. It is engaged in the manufacture of paper and paper products and uses vast quantities of wood in this operation. One gathers that the bulk of the wood so used is hauled to the plant in the form of wood chips which are the by-product of the several saw mills located in the surrounding area.

In order to transport the wood chips from the several saw mills to the Waldorf-Hoerner plant, it entered into a contract, the details of which are not pertinent here, with Missoula Cartage to do the hauling. From the record we learn that Missoula Cartage owned the tractors that pulled the large open-bed trucks and that the trucks themselves, wherein the chips were placed, were owned by the defendant, Waldorf-Hoerner. The

combination of tractor and truck resulted in an outfit some 55 feet long, 13½ feet high and 8 feet wide, and from pictures introduced in evidence one gathers that the truck bed is not dissimilar in size to the ordinary railroad box car. These large trucks were filled at the source of supply with these wood chips, which were piled in loosely to the very top, sometimes covered with a tarp and then hauled to the Waldorf-Hoerner plant. Upon arrival it is necessary for the driver to drive into the plant, swing past the unloading dock and then back his load in where the front end of the truck is lifted up so that this large load of wood chips is spilled out into a bin and thence conveyed by a conveyor system to the supply pile. It should be noted that when an outfit drives in to unload, the custom and practice was, and is, for the entire tractor and truck to drive past·the unloading dock and then back in, and it certainly would be visible to anyone in that immediate area. Not only were these chip hauling outfits large, but also, the evidence is that the motors pulling the same were quite noisy.

Immediately over and surrounding the unloading dock there was, and is, a large amount of steel construction made out of, principally, "I" beams and girders. This framework is a part of the basic construction of the Waldorf-Hoerner plant and for the proper maintenance of the same it is necessary that it, from time to time, be painted.

Pursuant to the need of proper maintenance, Waldorf-Hoerner employed the B & L Painting Company, an independent contractor, to paint, the "I" beams, scaffoldings and girders just mentioned above and under and between which these large tractors and trucks pass in their unloading operations.

Plaintiff was a painter employed by the B & L Painting Company and on August 14, 1962, was 34 years of age. He had learned his trade from his father and stated that he had started painting when he was age 13. On the date in question he had been regularly employed in painting at the Waldorf-

Hoerner plant for some four weeks and his particular job was that of a specialist in "high" work. On the morning of the accident, he rode out to the job from Missoula with his foreman, Charles Schmiedke, Jr., in a company pick-up truck. After being admitted to the plant these two went over to the paint shack, changed into their painting clothes, mixed the paint for the day's work and then went over to the tower or scaffolding and framework which is located immediately adjacent to and above the unloading dock described herein. In order to reach the "I" beam and girders, which plaintiff was to work on that day, he used what is called a "bos'n" chair, which is a sort of a swing wherein the workman seats himself and fastens himself in, hooks on a can of paint on each side and by some means attaches his brushes and then, by means of a rope and a series of pulleys, pulls himself up to his place of work. These chairs are in common use for painting in such circumstances and the plaintiff had used this means of reaching his work on many prior occasions. The upper pulleys through which the rope was placed were directly in the center of the driveway wherein these loaded chip trucks were backed to unload their loads. The testimony of the plaintiff is, and it is not contradicted, that he went to the center of the driveway to get into his "bos'n" chair; that in so doing he had his back toward the entrance to the unloading dock and to the lane of traffic which would necessarily be used by any truck backing in to unload. He stated that it takes about a minute to get into the chair and there was further testimony that it would take him some three to four minutes to hoist himself 14 feet so as to be above the top of any incoming truck. During his work he had noticed the coming and going and dumping operations of the chip trucks and was familiar with their presence in the area. At the time in question his foreman and companion climbed to the top of the tower to adjust the upper pulleys, and he saw the entire occurrence. After getting into the chair, plaintiff started to raise himself and when he was about four feet off the ground

saw, for the first time, that one of the trucks was backing in to unload. He was called upon to make an instantaneous decision as to whether to let go of the rope and fall to the ground and attempt to roll to one side, or to attempt to hoist himself high enough to avoid the oncoming truck. He chose the latter and the result was that he was struck in such a manner that he swung out and then he came back and lit on top of the truck. His testimony was that he whistled and yelled at the driver but that apparently he was not heard. It is the testimony of his foreman, Schmiedke, that he too whistled and yelled. The evidence indicates that probably the noise of the motor prevented either being heard. Immediately following the accident, the plaintiff climbed down off the top of the truck and shortly thereafter was taken to town to be examined by a doctor. He did some work the next day on this same job but has not worked subsequent to that time.

This action was brought against Waldorf-Hoerner and Missoula Cartage, and in his complaint plaintiff charges these companies with negligence and that their negligence caused the accident and the injuries. The negligence charged is as follows:

(1) That the defendants negligently and carelessly caused the said truck and trailer combination rig to be operated on the premises of defendant Company without providing for and the keeping of a lookout for plaintiff Richard A. Stevens;

(2) Without providing for and the giving of warning to plaintiff Richard A. Stevens that the said truck and trailer combination rig was going to be backed up into a position where it might collide with and strike plaintiff Stevens;

(3) Without providing for and the giving to plaintiff Richard A. Stevens a safe place in which to work, while plaintiff Stevens was performing the duties entrusted to him and commanded of him by the B & L Painting Company, and while plaintiff Stevens was on defendant Company's premises, and

while plaintiff Stevens was in a precarious and perilous position.

As this court understands these allegations what they amount to is that the defendants are charged with (1) failing to keep a lookout for the plaintiff; (2) failing to warn the plaintiff; and (3) failing to provide a safe place in which to work.

At the conclusion of plaintiff's evidence, both defendants moved for a directed verdict which the district court granted. In support of their motions, both defendants argued, among other grounds, that plaintiff's evidence established his own contributory negligence and thus barred recovery. In granting the motions of the defendants, the district court made the following finding: "The Court finds as a matter of law that the plaintiff was guilty of contributory negligence which contributed as a proximate cause to his injuries and the jury will be directed to return a verdict for the defendants."

Plaintiff properly notes that this court in reviewing the correctness of the district court in granting the motions for directed verdict must view the evidence "from the standpoint most favorable to plaintiff, and every fact must be deemed proved which the evidence tends to prove." Mellon v. Kelly, 99 Mont. 10, 20, 41 P.2d 49, 52, Teesdale v. Anschutz Drilling Co., 138 Mont. 427, 357 P.2d 4.

In George v. Northern Pacific Ry. Co., 59 Mont. 162, 171, 196 P. 869, 870, this court made the following observations concerning the defense of contributory negligence:

"In this jurisdiction it is the rule that contributory negligence is a matter of defense to be established by preponderance of the evidence. The plaintiff has made out a *prima facie* case when his evidence discloses injury to himself and that the negligence of the defendant was the proximate cause of it. [Citing previous cases.] It is the rule also that when the circumstances attending the injury, as detailed by the plaintiff's evidence, raise a presumption that he was not, at the time, in the exercise of due care, he has failed to make out a case for the jury. The

burden is then upon him, and if he fails to introduce other evidence to remove the presumption, he is properly nonsuited. [Citing previous cases.]

As we have previously pointed out, plaintiff was familiar with the fact that the unloading area was in constant use. He had seen the chip trucks backing into the unloading area. Yet, by his own testimony, which we will set forth, plaintiff admitted that he took no precautions whatever to protect himself from injury.

On cross-examination the plaintiff explained his action on the day of the accident in this manner:

"Q. And whatever the reason it is the cold fact is it not, that you didn't take one iota of precaution for your own safety? A. I just did what I did every day. I didn't pay any attention, you are right.

"Q. Either by your use of your sense of hearing, your sense of vision, or anything else, that is true, is it not? A. Your sense of hearing is nullified by hearing noise.

"Q. You didn't use your eyes to try to protect yourself? A. I didn't look.

"Q. And you didn't put any signs up yourself, did you? A. It wasn't my job. My job was to paint.

"Q. You didn't do a blessed thing to look out for yourself? A. Absolutely not."

Thus, the evidence presented by the plaintiff, viewed in any light, reveals that plaintiff was familiar with the unloading area; that plaintiff knew that trucks backed into the area frequently; that plaintiff knew the trucks could only come from one direction to back into the unloading area; and that plaintiff knew that the unloading area was a dangerous place in which to linger. Despite the knowledge of these facts, plaintiff fastened himself in the "bos'n" chair with his back to any approaching trucks.

These activities on the part of the plaintiff under any theory cannot be called "the exercise of due care." The district

court was correct in finding that the plaintiff was guilty of contributory negligence as a matter of law and that such contributory negligence barred recovery from either of the defendants.

Finding no error, the judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR, DOYLE and JOHN CONWAY HARRISON concur.